UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------------------

UNITED STATES OF AMERICA,        )
                                     )
                 Plaintiff,     )  Case No. CR 17-31
                                     )  Milwaukee, Wisconsin
    vs.                      )
                                     )  July 13, 2017
KENNETH CHURCHILL,            )  9:00 A.M.
                                     )
                 Defendant.    )

--------------------------------------------------------------------

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:         Office of the US Attorney
                             By: BENJAMIN W. PROCTOR
                             517 E Wisconsin Ave- Rm 530
                             Milwaukee, WI 53202
                             Ph: 414-297-4525
                             Fax: 414-297-1738
                             benjamin.proctor@usdoj.gov
                             benjamin.wesson@usdoj.gov


For the Defendant
KENNETH CHURCHILL:         Terschan Steinle Hodan & Ganzer Ltd
 (Present)                By: MICHAEL J STEINLE
                             309 N Water St - Ste 215
                             Milwaukee, WI 53202-5713
                             Ph: 414-258-6200
                             Fax: 414-258-8080
                             mjs@tshglaw.com


U.S. Probation Office:     JAMES P. FETHERSTON (414) 297-1736


U.S. Official Transcriber:  JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:        WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



TRANSCRIPT OF PROCEEDINGS

Transcribed From Audio Recording

\*    \*    \*

THE COURT:  Have a seat, everyone, please.

THE CLERK:  This is the *United States of America vs. Kenneth Churchill,* Case No. 2017-CR-31, here for a sentencing.  May I have the appearances, please, starting with the government?

MR. PROCTOR:  Good morning, Your Honor.  Benjamin Proctor appears for the United States.

PROBATION OFFICER:  Good morning, Your Honor.  Jim Fetherston from Probation.

THE COURT:  Good morning.

MR. STEINLE:  Good morning, Judge.  Mike Steinle appearing on behalf of the defendant who appears in his own person.

THE COURT:  Good morning.  Good morning, Mr. Churchill.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  We are here this morning for a sentencing for Mr. Churchill.  And before we proceed any farther, I just want to go over the documents that I have to make sure that we're all on the same page and have the same materials.

I have a pack of letters and other information that Mr. Steinle filed on behalf of Mr. Churchill back on June 30th.

It includes a letter from Aurora, and several letters from people who are close to Mr. Churchill, and a letter from the Make a Wish Foundation.

Then, on July 6th, Mr. Fetherston filed the Revised Presentence Investigation Report.  I have that.  I also have a letter from Mr. Proctor dated July 5th.  And then, finally, I have a July 12th letter from Mr. Steinle.  It's just an additional letter from Ms. Medina that didn't get included I guess in the original packet of letters.

Is that what you've got, Mr. Proctor?  And I just want to make sure I'm not missing anything that anyone filed.

MR. PROCTOR:  You're not missing anything, Your Honor.

THE COURT:  Okay.  Mr. Steinle, anything?

MR. STEINLE:  That completes everything, Judge.

THE COURT:  Okay.  And have you had a chance, Mr. Steinle, to go over all of these things with Mr. Churchill, including, of course, the revised presentence report?

MR. STEINLE:  In very great detail, many times.

THE COURT:  I can imagine.  All right.  You as well, Mr. Proctor?

MR. PROCTOR:  Yes.

THE COURT:  Then, Mr. Proctor, is there any reason that the government can advance for why we shouldn't proceed to sentencing today?

MR. PROCTOR:  No, Your Honor.

3

THE COURT: Okay, Mr. Steinle?

MR. STEINLE: No, Judge.

THE COURT: Okay. So what I'd like to do first is go over the guidelines calculations. I understand and I know Mr. Steinle filed a letter indicating that Mr. Churchill is not objecting to any of the information in the presentence report, but for the record I want to go ahead and go through those calculations.

The presentence report indicates that the base offense level for Mr. Churchill, based on a total of 100 grams or more of heroin, is 24. The presentence writer recommended, and I think the plea agreement did as well, a two-level addition under 2D1.1(b), as in boy, (1), because of the possession of a firearm during one of the offenses. Actually on the date of arrest, I believe.

And that brings us to a total of 26. The plea agreement recommended that I reduce that level by two because Mr. Churchill pled guilty and accepted responsibility for his actions and indicated that if he continued acceptance of responsibility between the date of the plea and today's date, that the government would be recommending a third level off for acceptance of responsibility.

Mr. Proctor, is the government making that recommendation?

MR. PROCTOR: Yes, Judge.

4

THE COURT: All right. Then I'll grant that request and I'll grant the third level reduction. So that takes us down from level 26 to level 23. Any objection to that calculation, Mr. Proctor?

MR. PROCTOR: No, Judge.

THE COURT: Mr. Steinle?

MR. STEINLE: No, Judge.

THE COURT: Okay. The presentence report also indicates that Mr. Churchill has no prior convictions that result in any countable points toward his criminal history category; therefore, that he is in criminal history category I.

And according to the presentence report as well as my own calculations, revised offense level 23 in criminal history category I yields a sentencing range of 46 to 57 months. Mr. Proctor, any objection to that calculation and to that advisory sentencing guideline range?

MR. PROCTOR: No objection, Your Honor.

THE COURT: Mr. Steinle?

MR. STEINLE: No, Judge.

THE COURT: Thank you. So that will be -- I will adopt those calculations and I will find that the revised offense level for Mr. Churchill is 23, that his criminal history category is I, and that his advisory sentencing range is 46 to 57 months.

So, Mr. Churchill, what we're going to do next is I'm

going to ask the attorneys to provide me -- I think I told you at the plea hearing that while that sentencing guideline range is what it is, it's advisory. I'm not required to follow it. I can sentence above it or below it or within it.

And so I'm going to hear from the attorneys now about what their recommendations are for what they think the appropriate sentence should be and why. And I start with Mr. Proctor because the government brought the charges, and then I turn to Mr. Steinle. When Mr. Steinle's finished, if you have anything you'd like to tell me, I'm more than happy to hear from you. That's what I'm here for today. I want to make it clear that you don't have to tell me anything. If you don't want to speak, that's fine, too, and I won't draw any conclusions from that. But if you do have things you'd like to tell me, that would be the time to do it. Okay?

All right. Mr. Proctor.

MR. PROCTOR: Thank you, Your Honor.

Based on the investigation in this case and on information provided in the presentence report, I see several sides to this defendant. I see a business person who has a profitable limousine business. He also has an assortment of rental properties that had brought him significant income over the past few years.

I do note that the City of Milwaukee has designated his rental properties nuisances. So that is kind of its own

6

matter. But he has been a successful business person with this limousine business for sure.

He's also a heroin addict. I think that came through during some of the presentencing activities in this case. We were before Magistrate Judge Joseph on a few occasions. And in the presentence report he indicated he started using heroin following an addiction to opioids.

And third, we have a drug dealer. We have someone who distributed a significant amount of heroin in this community. I see all these sides playing into the offense that brings us before the Court today.

Now, Mr. Churchill is, as the Court noted and the parties agree, responsible for distributing at least 100 grams of heroin, between 100 grams and 400 grams of heroin over the course of several months. Now, the 100-gram mark was met by the controlled transactions with the DEA alone. That's 100 grams at least that, as far as Mr. Churchill knew, were going to end up on the streets of Milwaukee. And as this court has heard me say before when we have heroin dealers appear for sentencing, the heroin crisis in this community is killing people on a regular basis, either through overdoses or through violence associated with drug trafficking on the streets. The news has reports of this all the time.

And Mr. Churchill played a role in that heroin distribution that is causing so many problems in this community,

and he wasn't simply doing it to further his own addiction. Mr. Churchill was a man of means, as indicated in the presentence report. He was distributing heroin because he liked being a heroin dealer. For whatever reason he had to do that.

And importantly, he carried a loaded weapon, a loaded firearm on him as part of his activities and at the time he was arrested, along with 35 grams of heroin in anticipation of a deal.

Now, looking at his background, he has a limited criminal history, recent criminal history. That, compared to many others who appear before the Court, is much less. And that is to his credit. It's also to his credit that he timely accepted responsibility in this case. And I address that a little more in detail in my letter.

And as the Court knows and as Mr. Churchill knows, if he had done things differently and not wanted to take responsibility, he could be facing much more serious penalties than he is today.

It also appears that he's been genuinely remorseful for his conduct, and that he's apparently been doing well in his most recent rehabilitation effort despite some issues early on. But being successful most recently is also to his credit.

So the question here today is what is the appropriate sentence based on the pertinent goals of sentencing. And I see the key goals here as being promoting respect for the law,

providing a measure of deterrence, providing just punishment, and keeping the community safe. We have a person who sold a not insignificant amount of heroin over several months, enriched himself by these activities, and increased danger to everyone involved by carrying a loaded firearm.

With this in mind I believe a term of incarceration is necessary and appropriate, and I think the community expects that. We need to send a message that this kind of conduct is not going to be tolerated.

As noted by the Court, the guidelines range here is 46 to 57 months. That's a range that's anticipated by the guideline calculations in the plea agreement. And I believe that the terms of the plea agreement under all the circumstances are very fair to the defendant and appropriate in this case and, therefore, I'm recommending a term of incarceration within the guideline range.

Also, Your Honor, there is a reference to a fine in the plea agreement. As noted in the presentence report, that is a substitution for buy money. We used to do buy money in plea agreements. I'm now recommending that as a fine per Department of Justice policy.

Thank you.

THE COURT: Thank you, Mr. Proctor. I apologize to everyone for the accompaniment to today's proceedings. They're doing construction in a courtroom upstairs and apparently today

9

is hammering day.

MR. STEINLE: I think we should blame it on Judge Stadtmueller.

THE COURT: You do that, Mr. Steinle. I'm just going to sit here.

MR. STEINLE: Okay.

THE COURT: Mr. Steinle.

MR. STEINLE: Judge, the comments by Mr. Proctor were very fair. I don't agree with his conclusion that Mr. Churchill deserves 46 months in prison, though. I can tell you as he's sitting here, he begs for probation. I've told him since the day he walked into my office that this is probably not a probation case. It could have been had there been more cooperation. As you know from the letter, he did cooperate and I think you can take -- even though the government isn't making the motion, I think you can take some of that cooperation into consideration.

Although I agree with the government in this negotiation, Judge, he was not charged with a gun, which usually as we all know could have been another five years. And that's a significant benefit that the defendant received as a result of it. And also the charging of the document, obviously the quantity of it also gave him.

So I'm not saying the government's been unfair to him. But I think that most clients that sit next to me are

unrealistic. When I say that is, is half my job is just getting reality pounded into their head. But I don't think, Judge, that a sentence of 46 months is necessary in this case.

And one thing I do disagree with Mr. Proctor is, is that I think that defendant's drug addiction to heroin caused him to be in this court. There's no question about it, that I believe that he would have never otherwise dealt heroin had he not developed such a bad heroin addict. And I wish he would have told me that when he came into my office.

I did not even learn, honestly, that he was a heroin addict until the plea sentencing hearing when you had him go and sign his bond and he tested positive. I was astonished. I really was. I could not believe that, in fact, he had the addiction that he did.

And then to learn subsequently that, when I confronted him with the testing positive, he indicated it wasn't a problem, it wasn't a problem, it wasn't a problem. Well, it was a problem. It was a major problem in his life, to the point where he now tells me he was doing a gram of heroin a day.

That's a lot of heroin — snorting a lot, a lot of heroin on a daily basis. And thank God he was a man of means in order to support that habit with regard to it.

But I agree that heroin is just -- it's killing people. It is just the nastiest thing out there. And it's not discriminatory. When I say that is, is I don't care what county

11

in this state I've been in, Judge, defending people with heroin in heroin death cases, it's white, black, rich, poor, Indian. There is no discrimination to this drug on who's taking it.

And I don't understand why people, when you tell someone that you're going to be addicted virtually the first time you take it, why they still take it. It boggles my mind.

But here we sit. Mr. Churchill, 48 years of age. For the most part, Judge, his convictions go back when he was 15 and 20 years old, so 28 years ago. So I don't think you can say he's criminally orientated.

His mother dies at age 21. He quits high school to support himself and buys -- basically starts driving a limousine and sees that there's potential in this. And then now, as he's sitting here, he owns 20 limousines in probably the biggest limousine company in Milwaukee. Very successful man.

And then what does he do? And he has not built that on selling drugs or anything like that. There's absolutely no evidence of that. He then, with no high school education, he then is smart enough to invest in real estate property and creates a real estate empire.

But I think that obviously his drug habit, Judge, he's now got problems with the city as nuisances with regard to that. And you read that. I'm not his lawyer in that matter, Judge. But I think that's all a direct result of his spiraling out of control with his heroin.

So once on top of the world, Judge, he's now as low in the valley as he can be and off to prison. And it's sad. It's very sad. As you can see from the presentence report and the letters, he has a lot of support. He even has the support from a former girlfriend who is running his company and the two women get along. When does that happen? As she even says to me many times, "I don't know what it is, he's just such a decent human being that I can't walk away, I have to help him." And she's been at his side despite the fact that, in fact, they are no longer together.

He has three children, they're all grown. It doesn't appear to be that they've been in and out of the system. He doesn't have the greatest of relationships with them, but at the same time they're grown and they're prosocial, stable people in this community, Judge.

As indicated, I don't think he's criminally orientated. I don't think there's a pattern of criminal activity up until you look at when he starts obviously getting addicted to the pills. And then he starts using heroin. And then in order to get heroin, what do you do is you buy even more heroin so you can use it yourself.

And 100 grams is a lot, Judge. But we're not talking about kilos. He's not a sophisticated dealer where he got to the level where this was his primary source of income with regard to it. It is that he was more, if you will, an ounce, a

half-ounce dealer of this. He had not risen to the level of what we see as the big, if you will, the drug cartels that come before this court or in the Eastern District of Wisconsin where you're talking about multiple kilo level dealers of cocaine, heroin, whatever it may be.

He's also a decent person. I think, although it's only one example, but giving donations to Making a Wish Foundation. He has given back to this community. Unfortunately he ruined the community by distributing heroin within it. But, he gave back. He did do that. And I think he was trying, if you will, to play both sides of the fence and hide this from people is what he was trying to do with regard to it.

He did accept responsibility as indicated in the government's memorandum to you, Judge. He did that without a lawyer and he did it long before I was involved in his life. He did that without counsel whatsoever. He jumped on board. He did what he had to do.

Originally he came and saw me. He chose to go with another lawyer. And then there was no contact with the lawyer and he came back. But by that time the cooperation had all been completed by that time. And he did everything that he could with the connections that he had, Judge.

So, in fact, he has been extremely cooperative in this case. In my estimation, Judge, is for most people that come into the federal system he is a personification of acceptance.

Only because many times, as you know, sitting in my seat, is you have to convince people that these sentencing guidelines are going to absolutely choke you and you have no option but obviously to do what the defendant did.  He did that without even counsel, Judge, and I think that that's significant.

I've said it now three times, I'll say it four, is there are just significant AODA issues, Judge.  I'm asking you to consider the 500-hour drug treatment program in this case, Judge.  The presentence is replete with all the drug issues that he has dealt with.  And I think just his conduct while out on bail shows that, in fact, he was in denial.

When I say that is, is he tried in the very beginning to go to treatment himself.  That didn't work.  They sent him to Genesis, that didn't work.  And then finally, after he went to jail, he realized how bad this was and he, in fact, enrolled in Dewey and he's been taking that seriously.

And, again, he spent a significant amount of money on that himself.  Not to be patted on his back, but I think that he is finally at an area in his life, Judge, we call it rock bottom.  I think he's at rack bottom and I think obviously every day after today will be a better day for him.

So his actions warrant incarceration, Judge.  I don't think 46 months is necessary in this case.  I think the fact that -- and it's not true with most people I sit with, Judge, but the felony is going to impact him.  I mean, he's a convicted

15

felon. Obviously that's going to affect him. If and when he gets out and he has to do loans and do other things, Judge, obviously that is going to affect him.

His involvement in this case, Judge, is, as I kind of already said it, but I don't think it was on a sophisticated level. He was although dealing while we would say large amounts of heroin, it wasn't, again, in the sophisticated conspiracy amount where there were many, many people involved and a lot of money changing hands with regard to it.

What I'm trying to say, Judge, is, is that this man was leading a very successful life but a very unfocused life because of the heroin that he was doing.

I'm here to tell you that I truly believe that from this day forward he can conform his conduct to the requirements of the law. I think he understands his problem. He's got the capacity, he's proven to this community that, in fact, he can do it. Other than if you take out the last two years of his life, he's motivated to do that. He has the intelligence. Despite the fact that he doesn't have the education, he does have the intelligence to turn this around. He just needs to stay away from the addictive personality that he has to drugs and alcohol.

And I think that if you look at the prior record, even though I'm asking you not to consider it, but if you look at it most of it is alcohol and drug related way back even when he was a child.

16

So for all those reasons, Judge, I'm asking you, don't give undeserved punishment to some well-deserved punishment. I'm asking you to consider a sentence in the area of 24 months with the drug treatment program.

And lastly, I'd ask that you at least make a recommendation that he be designated to a place closest to home so at least he can assist in the running of his business from the institution.

I believe that Ms. Gutierrez -- or Medina, I'm sorry -- I know she submitted a letter, I submitted it to you yesterday -- she just want to make one brief comment before. And she's not going to read the letter, she just wants to make a brief comment.

THE COURT: She's welcome to say whatever she'd like, or anyone else.

And before you start, could you just tell us your whole name, please.

MS. MEDINA: Good morning, Your Honor. Rosemary Medina.

THE COURT: Good morning.

MS. MEDINA: I stand here before you this morning -- it's a little tough. Never thought that in 11 years we would have been standing here for Ken. The guy has worked numerous of years to get where he's at today. If you would have told me this would have been in my future, to be sitting here today, I

would have bet no. This is the part that all of us can't walk away. I will be here to the end, as I told him. We worked very hard to get where we are today. I'm scared he's going to lose everything for one mistake.

As we all stand here today, we all have made numerous mistakes in life. And for him to be given so much time for one mistake that we all have made when he's, at the end of the day, a very good person, again, this all started from his back pain and one thing led to another.

Yes, he made a mistake. But I'm asking you to consider your time and his life, for him to lose everything he's worked for, and again to lose your mom at such a young age, he could have turned down any other wrong road and decided to make a good life for himself.

He's been a good person. He raised my daughter. We put her through college. She's in the criminal justice now. I head her towards that road. He just took her as his own. And Ken's been just -- he's just a great guy that just did one mistake. He's genuine. He's always helped the poor. Numerous of times we found out people that didn't have food and there we were. Not even worrying about Pick 'N Save, the total of the price of the groceries, let's get what they're gonna need.

From clothes given to people he didn't even know. Just a friend that he knew that needed clothes. I have extra clothes, Rose, clean out my closet, we need to give them because

they don't have and we are blessed and we have.

Make a Wish Foundation. The kids who have that last dying wish, there was Ken giving them a limo. Two days later we would get notified from the Make a Wish Foundation that the child passed away. St. Jude. Not knowing these families from Adam, and always wanted to give. Always was giving to give anything and everything, whatever he would give you, the shirt off his back to his last dollar for these families that did not have.

He's well taken care of, worked out great in life, but yet not a high-maintenance guy. Always, well, we can go to Walmart, we don't need the high-end clothes. We have what we have and we're blessed with what we have, we need to give more to others.

So I'm shocked today that we're here. But it's one mistake that he made. And I guarantee, after all this is over with, and as I told him, this will pass. This will pass. And I guarantee that Ken would never be involved -- you'll never see him again in a courtroom because this is not his character. It's just -- it's just been hard for all of us.

And as I told him, we will get past this and move on. And I will continue for him, do the best that I can. It's been a challenge. It has been a challenge. A lot of work. But we've made it grow today from working 12- to 16-hour days, where sometimes I have to tell him, you need to stop and eat.

19

Ken hasn't taken a vacation in over 20 years. As our daughter got older, I said I have to take her to Florida and do things with her because it can't be work, work, work. We have to take out time for her. His vacation for us was Wisconsin Dells because we gotta get back to the company. We've got the bills, we've got people depending on us. We have contracts, we have weddings, people are relying on us. We have to go, go, go. And I told him, Ken, at the end of the day, if God takes you you're still gonna get that final bill. You have to take out time for yourself.

To this day Ken has not taken a vacation. Our last vacation was in 1997, because everything was work, work, work for him. My mom would beg him all the time, you gotta take time out for yourself. Mom, we have to work, we have to work, we have to -- people are depending on us, people need us.

He always put himself last. Even when it came to eat. Ken, you have to stop and eat. I would have to threaten, okay, I'm going to transfer the phones and turn them off on the cell phone if you don't eat. Oh, don't do that, the bills. We got bills. Don't do that. Okay, fine, I'll eat. Get something, I'll eat.

From him to giving to just people that didn't have, dropping off groceries where these families did not know him from Adam. And there goes Ken knocking on their door, four bags of Pick 'N Save, full of meat, down to the seasonings. He would

20

find out what the kids, what do they use.  From clothes. Literally would take off out of his closet gym shoes.  The drivers needed gym shoes or someone, hey, here's gym shoes, I just bought them, I only used them one time, take them.  Always giving.

At home we never needed anything.  I didn't have one, I had five.  So for us to stand here today and to send him away for five years or four or three, I hate for him to lose everything that he's worked for for one mistake.  We've all made mistakes in life.  This all because of his back pain.  One thing led to another.  And it just hurts us all inside for him to go into a place that he's not familiar with at all.

Go away with anything, what happens to him?  He's not a fighter to defend himself.  He's not used to being around criminals.  It's not his lifestyle, at all.  He's just, at the end of the day, a good person, a very good person.  And for us to be here today, I would have never imagined in a million years this would have been in our journey.

But we will continue.  And it's like I told him, God will be here and this will surpass and God will help you with whatever the judge would decide today.  I'm begging you for consideration on his life, for a person who is a good, genuine person, at the end of the day, that's made one mistake and admitted himself to be cleaned.  Made his own decision to pay because the insurance would take too long.  He's like, I have to

21

do this today and move on from this.

So I'm asking you to consider his life is in your hands. For someone to make one mistake, please consider him today. Because, at the end of the day, Judge, he's a wonderful guy that made one mistake.

Thank you.

MR. STEINLE: Judge, I just -- I'd be remiss if -- there's statements that he made one mistake. Drug dealing is not one mistake, and I've told this to both my client and the family. I think what they're referring to is the mistake of getting involved in drug dealing. So I don't want it to misinterpret that somehow or another he's trying to say that I've only sold heroin one time in my life.

THE COURT: Thank you, Mr. Steinle. I appreciate that.

MS. MEDINA: Thank you.

THE COURT: Mr. Churchill, is there anything you'd like to tell me?

THE DEFENDANT: Your Honor, I wrote a letter.

THE COURT: It's up to you. If you want a minute to catch your breath, you're more than welcome to take it. We're here for you so....

THE DEFENDANT: I mean, I know what I did, Your Honor, was not justified. I just wish I was more educated before took those Percocets, not knowing what I was putting in my body. I

would have never been involved in something like this. Heroin is a strong addiction. I thought it was something I could do on my own. I couldn't. I mean, one thing I am thankful about this is, it did get me clean today. I've been clean for over 60 days. So that's something positive.

But I just -- I hope you consider something decent for me, Your Honor. I won't be able to read this.

THE COURT: It's up to you. Or you can give it to me if you want. Whatever you want to do.

THE DEFENDANT: I'd rather do that.

THE COURT: Okay. That's all right. I'm going to read it. Thanks.

MR. PROCTOR: I've seen it, Judge.

THE COURT: So if it's okay with you, Mr. Churchill, I'll read it so the government and probation can hear it.

(Reading) *I'm writing you this letter to kind of explain how I got myself into this situation. About five years ago I had a lot of back issues. And a guy I knew had some pills for his cancer. He knew I was in lots of pain so he kept telling me to try them. It would take the pain away.*

*Not knowing it was heroin in pill form, I tried them and it did take the pain away. I never knew they were addictive. That's when my life started going downhill. One thing I can tell you, if I wasn't under the influence I would never have gotten the DEA the drugs. I've never sold drugs in*

23

*the 48 years.*

*I've always had a job. As you know, I've never really been in trouble or was a troublemaker. I do not think I deserve to go to prison over one mistake that I made in life. I promise you I've already learned my lesson. I've been in business over 20 years and worked very hard seven days a week to get ahead in life. That means that while my friends were out having a good time on the weekends, I was working.*

*I worked very hard with endless hours, Your Honor. To lose my company, Your Honor, not only would my company suffer if I was in prison, but so would my employees. I hope and pray you consider probation for me. And I would take full responsibility if I could mess up and you could put me in prison and throw away the key.*

*I also would do some good while I was out here. For example, I've been doing some research on opening some sober living houses for men and women. Milwaukee lacks places to go when people are discharged from rehabs, which is a big problem for people who are trying to stay clean and sober.*

*I also have done a lot of good things like sponsoring Make a Wish for the kids who have life-threatening diseases. I've sponsored Make a Wish for over 10 years. I love working with the kids.*

*I hope you judge me by my past and not my mistake I made. I promise I will not let you down, Your Honor. I also*

*would like to thank you for giving me another chance to get my life back together. Since I've been off heroin and Percocets I think clearly again. I'm back to the old Ken again which I can honestly say now I like him. I never knew that a drug could be so strong and take a person's life from being so good to being so bad.*

Thank you, Mr. Churchill. Mr. Steinle, anything else?

MR. STEINLE: It's just -- there's on the very first page it says "prior to this incident," and he was referring to --

THE COURT: Oh, yes.

MR. STEINLE: -- he was referring to the fact that he had never sold drugs again. He didn't want to say that, in fact, he had never sold drugs; but prior to this addiction he had never involved himself. Again, my argument is, is he didn't create an empire by selling drugs.

THE COURT: Thank you, Mr. Steinle. And I did neglect to read the three words that are in the margin to the left. I missed that. Thank you.

At the beginning of his remarks Mr. Proctor said that he saw several different Mr. Churchills, if you will. You know, as the businessman, there was the heroin addict and there was the drug dealer, I think as Mr. Proctor described it. And as Ms. Medina commented several times, that never in her life would she have imagined that she'd be sitting in this courtroom having

this conversation with regard to Mr. Churchill.  And when I read the presentence report and all of the letters and the other information that Mr. Steinle provided, I had a bit of the same reaction which is that there -- I sort of saw two different people.

One of those people is somebody who clearly, despite the fact that he didn't finish school, has taken just shear hard work and energy and effort and created a life for himself that many people with better educations and sort of fancier pedigrees maybe don't have:  a highly successful limousine company; real estate business that maybe at one point was probably very successful.  Although as Mr. Steinle notes, one of the properties have now fallen into disrepair and have been used for things that the city would prefer that they not be used for.

A benefactor to the community.  Giving to charitable organizations.  The sorts of things Ms. Medina described.  Doing things for other people.  Someone who clearly is capable of having wonderful personal relationships with people — Ms. Medina, Ms. Gutierrez, lots of folks.  There are others who wrote in letters on behalf of Mr. Churchill.

So on the one side, the one half of Mr. Churchill --

And maybe it's more than half.  It probably is more than half I think for most people.

-- is the kind of person that all of us wish that our entire community was made up of — people who work hard, people

who recognize the gifts they have and are willing to give back and share.

And then there's the other piece. And by the "other piece," I'm not necessarily even referring to the heroin addiction. I'm referring to the dealing. And this is where I think one gets really confused and puzzled looking at Mr. Churchill's situation.

I can tell you, Mr. Churchill, I wish you were the first person who had ever told me that they had an injury, that they started taking prescription pain medication. I mean, in your case perhaps the Percocets weren't necessarily prescribed to you, but doctors prescribe Percocet for injuries all the time, and the next thing people knew they were addicted to the pills. And then when their prescription ran out, or God forbid their insurance ran out, they sort of found another way to get the pain relief that they needed and that was heroin. And you said it yourself, heroin is a strong addiction. I think that may be the understatement of the century.

Back before probably Mr. Proctor ever hit a courtroom, when I was sitting in the chair that Mr. Steinle sits in today, most of what I saw was cocaine and crack cocaine. And the attorneys have heard me say this before, but people thought that crack cocaine was the most addictive and horrifying thing that they could imagine. And there was the whole -- that was when the war on drugs started. And I look back today from the

vantage point I have now where almost every case I see involves heroin. And I don't mean to in any way, shape or form trivialize cocaine and crack because they are serious and destructive drugs. But they don't have anything on heroin in terms of the degree of addiction and how hard it is for people to fight that addiction. And I don't ever recall hearing about somebody taking crack one time and dropping dead. I've heard numerous stories of people, the first time they use dying. People taking heroin that's cut with something, lately it seems to be fentanyl, and one dose and they die.

I've commented on this before in another case that I have with Mr. Proctor. There was a weekend several months ago where I remember the Milwaukee Journal Sentinel reporting six people in a single weekend in the city of Milwaukee died of heroin overdoses.

Dying from a heroin overdose is a horrifying thing. But what might even be more horrifying is the destruction that it wreaks in people's lives. And you're experiencing that and you have.

But I'll tell you that I've had a number of heroin cases lately, most of them with a number of defendants, and I've seen a parade of people come through this courtroom who -- you know, people who have lost their children, people who have lost their livelihood. I had one person who voluntarily allowed someone to break her leg in order to get enough money to pay for

her next hit.

This stuff makes people crazy. And I say all that because one of the things that I have to take into account when I'm considering the appropriate sentence is the seriousness of the offense. Mr. Steinle made the point, as Ms. Medina was speaking and then again after I read your letter, Mr. Churchill, that you and several other folks had referred to the fact that you made one mistake. And Mr. Steinle correctly said that the one mistake is getting involved in heroin, it's not just doing something one time.

And I appreciate Mr. Steinle having said that and I understand why he did. But the thing that concerns me a little bit about people saying that you made only one mistake, Mr. Churchill, is twofold: Number one, a mistake is something that we do accidentally. We don't think about it, we don't choose to do it. You know, my glasses and your glasses are sitting on the table and I pick yours up instead of mine and it was a mistake.

At some point in time you made a decision to go from putting stuff in your body -- which was bad enough and which was destroying you and your health, but impacted you and the people you love -- you made a decision from going to putting it in your own body to putting it out there on the street for other people.

That wasn't a mistake, that was a choice. I know it was a choice that you repeated over and over, at least as far as

we know, one, two, three, four, five -- six times, but I'm fairly certain more than that otherwise the DEA never would have drifted across you.

The other reason that it concerns me a little bit referring to it as one mistake is that it was a shifting from using drugs to selling drugs and particularly selling drugs armed. And the Ruger that they found on you the day that they arrested you wasn't the only firearm you had. And maybe you're a collector, I don't know. And that's perfectly okay if you are. It's legal to collect firearms. But when someone who is dealing heroin also has kind of a stash of guns where they live, it presents a whole series of problems.

I understand that what you mean and what your friends and family mean when you say one mistake, is you point to all the good things Ken Churchill's done and then you say and then here's this bad thing. And I agree with that to a great extent. But it's a -- but when you decided to do the one bad thing you kind of like went for it.

And I agree with Mr. Steinle, I don't think your criminal history is -- to even call it a criminal history, quite frankly, overstates the issue.

Which sort of makes, again, even more mysterious this notion that, you know, here's someone who is financially stable -- not only stable but well off enough, as Ms. Medina indicated, to be able to help other people. So you weren't

doing it for money. I mean, you may have made money doing it, but that doesn't appear to be why you did it. You didn't apparently need to do it to feed your own addiction cause you had money to buy what you needed.

And so the mystery of why you decided to turn around and put it out there on the street for other people, some of whom may be kids, some of whom may have addictions worse than yours, some of whom may not be with us any longer, is confounding to me.

It's a little more confounding to me given the fact that unlike a lot of the people I see who come through, you seem to have had -- I think you had a stressful childhood, your folks didn't get along with each other and you knew that and you were not oblivious to that. And that was -- I can imagine how hard that would be to grow up in a home when there's a tension and you feel that tension.

So I can imagine that's difficult. But it sounds like you always had food on your plate and clothes on your back. And after your parents finally sort of went their separate ways, you became very close to your mom. I know she passed away when you were a young man, but you were an adult by that time. I mean, I've had folks come in who lost their parents when they were 10. And, you know, you and your dad maybe weren't the closest, but he supports you here which is a blessing.

And then, as Mr. Steinle said, you've got folks who

31

really care about you and support you today. So the old story about people who had nowhere else to turn and nothing else to do and knew nothing better and started dealing drugs because what else were they gonna do, they didn't have the brains, they didn't have the love, they didn't have support, they didn't have the background, they just, of course they're drug dealers, they don't know what else to do with themselves, doesn't apply to you at all. You, in contrast, are the guy who is the poster child for you can be anything you want to be.

So this is -- this sort of dichotomy of -- of a self-made -- really a self-made man, albeit with some help from some wonderful people, but a self-made man who is a great success in his community and is a great success among the people who care about him and who runs into an addiction problem, which I completely understand, but then leaps from there to being a guy who's got a Ruger strapped to his hip and 35 G's in a bag waiting to sell sort of makes a person's head spin.

And that's -- that's what I'm trying to get my brain around. You know, do I think that you are a career criminal? Of course not. Mr. Steinle said it, there's nothing in this record to show it. You have every tool in your toolbox not to be. So I'm not particularly worried about you running out there and starting a criminal enterprise once you get out of custody.

But I'm not sure -- when I look at the factors that I have to consider, things like deterrence, things like protecting

the public, things like punishment which is part of what I have to consider, I'm not sure what to do with somebody who wasn't driven to doing this by financial need and wasn't driven to doing it by a need to get money to feed an addiction, wasn't driven to doing it by having no other option.

Again, it wasn't a mistake. It was choice. And it was a repeated choice. One of the things that I did in thinking about this case today, and I appreciate that Ms. Medina asked me -- and many people in the letters asked me to think hard and to think long and to give a lot of consideration to what sentence I would give Mr. Churchill. I hope I do that for every person who comes into the courtroom because every life deserves someone to pay attention and to pay close attention.

But I have thought about this case a lot. And I particularly thought about it given all the other heroin cases that it just so happens I've seen recently. And I've looked at some of the other cases that I've had and some of the other sentences that I've imposed in trying to think through what the appropriate sentence might be for you, Mr. Churchill.

And as it happens, I had a case recently where there was a defendant who was responsible for about the same amount of drugs that you are here, in the 100- to 400-gram territory, and who also didn't have any prior criminal history and who also was suffering from an addiction. And I looked at that person's case and I thought, okay, so maybe that could be sort of similar.

Even though no two people are alike. And in that person's case that person got 47 months. That person, unlike you, didn't have some of the benefits of the background that you've had. That person also didn't try to cooperate, didn't provide any assistance to the government. And, as Mr. Proctor and Mr. Steinle have noted, you did. And you've made efforts to try to help out. And, of course, the consequence of that has been that you didn't face the kinds of charges that you could have faced. That person didn't have a firearm. So that person didn't have the support system that you have.

Does that mean that you ought to get the same thing or more? Not necessarily. But I make the point to say that while I understand completely why people would ask for probation and why you would and why the people who love you would, Mr. Steinle, who has experience over a broad spectrum with these sorts of cases, was right when he told you that it's not a probation case. It can't be. And one of the reasons it can't be is because there are other people who haven't had the advantages that you've had who were driven to do what they did for reasons that don't apply to you. And if I were to give you probation, after taking someone who had fewer advantages in life than you did and frankly more reason to get involved in the trade than you did, a prison sentence, that would be great for you and your family, but it wouldn't be fair from a system perspective. And that's part of my job, too. I have to look at

you as a human being, but I also have to look at all the other cases that come before me.

So what's the right sentence? If I knew the answer to that I would probably have a job that included running the world. I don't know what the right answer is because I can't sit here and tell anybody in this courtroom that if I gave you 1 year that would be perfect, and if I gave you 1 year and 2 months it would be awful, or if I gave you 10 years that would be perfect, but if I gave you 8 years it just wouldn't work.

So I've looked through all of the factors that I'm supposed to look through, considered the seriousness of the offense and how involved you were in it. I considered the efforts that you made, unsuccessfully at first, to get yourself off of the drugs, and then the efforts that you've made recently to get yourself clean. And I congratulate you from the bottom of my heart for being clean for 60 days, because that is not easy for someone who has a heroin addiction.

I also appreciate that you have paid for it yourself, financially. Although it's a double-edged sword. You're lucky. I know people who can't. I know people who would give their right arm to get into a Vivitrol or a Suboxone program and they can't because they have no insurance and no money.

So I give you credit for that. And I particularly give you credit for the fact that you have expressed remorse in the fact that you made efforts to try in some way if you could

to make things right by trying to cooperate.

And so, taking all of that into account, as well as considering the benefits that you received from the government in terms of the charging decisions that the government made, I'm going to impose a term of 40 months in custody, which is a sentence that varies below the guideline range, but I still think is sufficient to take into account the seriousness of the offense and the other factors in the 3553 -- in the statute.

I'm going to impose a fine as the parties recommended. And the parties have recommended a $9,050 fine. I will impose that amount. I do understand that that roughly equates to the amount of the buy money, but I'll impose that as a fine.

I also have to, as you know, Mr. Churchill, give you a $100 special assessment that's required for any count of conviction.

I am going to follow that sentence with a term of supervised release. And I'm going to go over the conditions of that supervised release in just a moment.

But I want to indicate that, because I don't want to forget it, that I'm also going to require -- or request that the Bureau of Prisons place you in the RDAP program, Residential Drug Abuse Program that Mr. Steinle referred to. And I wanted to make that note for the record so that I didn't forget it toward the end of today's proceedings.

I'm going to impose a sentence of 3 years of

supervised release to follow that prison term, Mr. Churchill.

And before I detail the conditions, Mr. Steinle, were there any that were laid out in the presentence report that you had an objection to or any parts that you had an objection to?

MR. STEINLE: No, Judge.

THE COURT: All right. I'm going to briefly go over the conditions, Mr. Churchill. You don't have to remember them. You'll go over them again when it's closer to time.

But, first of all, you can't commit any new federal, stated or local crimes. And while it often doesn't seem that way, using drugs illegally is a criminal act.

You cannot illegally possess any controlled substance. Now, I want to make clear for people in your situation, if you're prescribed medication by a doctor and you take it as the doctor directs, that's not an illegal use of controlled substances. But if you use medications in a way that's not prescribed by the doctor, or you use illegal controlled substances, then you're in violation of the terms of your supervised release.

You're going to be required to report to your probation officer within 72 hours of when you're released. And you'll get instructions on how to do that. You won't have to figure that out yourself.

After you report to probation, you're going to get instructions on how to follow the conditions of your supervised

release.  And, of course, you have to follow those instructions.

I think Mr. Steinle has probably talked to you about this extensively, but I'm going to say it again and I said it at the plea hearing:  You cannot -- you are now convicted of a felony.  You cannot possess, control, be around, have anything to do with firearms, ammunition, scopes, silencers, explosives, anything related you simply can't have.  That is a separate crime.  You can be prosecuted separately for it and, if convicted, sentenced separately for it.

You're going to be -- when you're first released you're going to be confined to the Eastern District of Wisconsin.  That's been the condition of your bond anyway so you're familiar with that.  You can't leave the district unless you have permission from probation.  And if they won't give it you can, of course, ask me.  I won't guarantee that I'll give it either, but I'll certainly be willing to consider the request.

You're going to be asked questions by your supervising officer sometimes maybe about your work, maybe about drug treatment, who knows.  You have to honestly answer those questions with one exception.  If the answer to the question would subject you to criminal penalties, to criminal liability, you don't have to answer that.  You still have your Fifth Amendment right against self-incrimination even while you're on supervised release.

I am going to require you to work full-time.  Usually

I have to say to people I know that's probably going to be difficult and so I'll give you -- you know how to work full-time. I don't think I have to tell you how to work full-time. I will tell you, though, that if you have any changes in your employment, if for some reason you decide to open a new business or change the parameters of your business, something along those lines, you do have to notify probation at least 10 days ahead of any change. If you don't have the heads up 10 days ahead of time and you need to notify them afterwards, you can do it within 72 hours afterward.

As you may have noticed from the presentence report, full-time is characterized as 30 hours a week. You seem to work a lot more than that, but I'm just letting you know that to meet the conditions 30 hours a week is defined as full-time.

You're going to be required to live at a place that's approved by the probation officer. That hasn't been a problem up until now, but I am going to continue that condition. It's partly to make sure that you're not exposed to things that could put you in harm's way and so I will require that. If you have any change in your living condition, you move or who you live with, anything of that nature, you have to notify probation 10 days ahead of time unless you don't have a heads up, 72 hours afterward. All right?

Particularly important in situations like yours, if you know that somebody is committing a crime or talking about

committing a crime or planning to commit a crime or bragging about what they've got to sell or asking you whether you've got something to sell or whatever else, you cannot associate with that person. That means texting, calling, riding in a car with, having lunch with. You just can't. Can't have any association with somebody who is involved in criminal activity.

The probation officer is, of course, going to come visit you at certain times. They'll give you a heads up on occasion, other times they won't. You have to cooperate with them. They'll come at reasonable times. Nobody shows up at 3:00 in the morning. But if there's anything laying out in the open that they can see that violates the terms of your supervised release, they can take it and you have to cooperate with them in taking it.

If at any point you're arrested, which I hope will never happen to you again, Mr. Churchill, or questioned by law enforcement, you have to let probation know within 72 hours of that happening. And that includes traffic citations. And it also includes if you're questioned by police even though it doesn't have anything to do with you. So, for example, if they're investigating some other criminal activity and they just want to know if you saw it or heard anything about it or were affected by it, you still want to notify probation. That is to avoid any crossed wires and confusion.

I don't -- I know that you have provided some

cooperation and you've been of assistance to the government.  If at any point you're approached by any law enforcement agency asking you to be an informant or to actually sort of work on a full-time basis for them, you can only do that with my permission.  And, again, that's to make sure that no wires get crossed and that if you're doing that, it's documented and everybody knows about it.

I am going to require you to participate in drug testing.  That's critical for you.  And any treatment that probation thinks that you need as a result of that drug testing.  The standard drug testing protocol is no more than six tests per month, but that can certainly decrease over time as long as you stay clean.  They don't want to see you if they don't have to, so it's in your hands whether or not that gets reduced.

I am going to allow you, of course, to pay the fine over time.  Although given the way your business has been in the past, if you are able to get back to that level again and you pay it sooner, you can certainly do that.  But we're going to start out at $100 a month and then we'll see how you do going forward, and if you are able to pay it off sooner you can certainly do that.

I am going to impose one other condition which is not in the presentence report, Mr. Churchill.  I'm going to require that within 60 days of your release that you work with your supervising agent to make an appointment to come in and talk to

me. It's not formal. It's not -- it won't be out here in the courtroom. I won't be wearing a black muumuu, it will just be a chance for me to check in with you and see how you're doing and see how you're transitioning, let you ask me any questions you want to ask or tell me anything you want to tell me. If you feel more comfortable having with Mr. Steinle with you, that's perfectly fine, he's more than welcome, but you don't have to. This is not a legal discussion, this is just a check-in for me to find out how you're doing.

As I indicated earlier, I will recommend the residential drug treatment program.

I'll also recommend, Mr. Churchill, that you be placed by the Bureau of Prisons in a facility as close as possible to the Eastern District of Wisconsin. Mr. Steinle's probably already explained to you, I don't have any control actually over the Bureau of Prisons. I can recommend to them that they make that placement, I can't make them do it. So I think they try as hard as possible to comply with recommendations if they can, but I just want to let you know the simple fact that I say it in the judgment does not mean that it will necessarily happen. But that's -- I'm more than happy to recommend that.

Just one final thing to tell you, but, Mr. Proctor, anything that I've missed?

MR. PROCTOR: Not that I can think of, Your Honor.

THE COURT: And there are no counts to dismiss here

because Mr. Churchill pled to an information, correct?

MR. PROCTOR: Correct.

THE COURT: Mr. Fetherston, anything I've not covered?

PROBATION OFFICER: No, Judge, other than appeal rights.

THE COURT: Yeah, thank you. Mr. Steinle?

MR. STEINLE: Judge, I'd ask for voluntary surrender.

THE COURT: Well, yeah, we'll get to that in just one second. Thank you for reminding me of that.

Mr. Churchill, I do want to tell you that you have a right to appeal the sentence that I just imposed, but you've got a limited timeframe in which to do it. It's 14 days from the day that I send out the written copy of the sentence. That won't be today. It will take me a few days to get it on paper. So once I send out the written copy and Mr. Steinle gets that, and you'll get a copy, too, you've got 14 days from that date.

I tell you that just to let you know that if you're considering appealing, you should talk to Mr. Steinle sooner rather than later because once the 14-day period passes, not the best lawyer in the world can do a whole lot for you. So you want to know that. All right.

MR. STEINLE: While we're there, obviously he's not going to appeal a sentence that's below the guideline range, Judge, and all the benefits that he's been given. But we've discussed it. But I will file a letter with the Court after

I've completely discussed it after today's date.

THE COURT: I appreciate that, Mr. Steinle. And while it is a below-guideline sentence, that doesn't necessarily mean that people don't still choose to appeal. So I trust that you will have your usual thorough conversation with Mr. Churchill about that.

MR. STEINLE: Thanks, Judge.

THE COURT: Mr. Proctor, Mr. Steinle has requested that Mr. Churchill be allowed to self surrender.

MR. PROCTOR: Your Honor, I'm obligated to point out Title 18 U.S.C. § 3143(b)(2). He's been convicted of a drug trafficking offense and custody is typically required.

THE COURT: I do appreciate your pointing that out, Mr. Proctor. Many of your colleagues have pointed that out to me as well, and I'm aware of the statute.

And that being said, I'm going to allow Mr. Churchill to self surrender as directed by the probation officer, which means that Mr. Fetherston will find out about what your designation is, Mr. Churchill, and then once -- and then usually what happens is the Bureau of Prisons, once they decide on the placement, they'll give you a date by which to self surrender.

I do want to make a couple of things clear:

Number one, as Mr. Proctor said, the statute directs me to take you into custody. I'm not doing that. What that means, though, is that if there are any violations between now

and the date that you do go into custody, including positive urinalysis, I'm left with little choice. You've been clean, as you said, for the last two months, you just need to keep it up until it's time to go.

A second thing I will tell you is this: Self surrender is a privilege. And what usually happens is you get a letter saying that you must report to, fill in the blank, by noon on for such and such a date. If they require you to appear at noon on such and such a date and you're not there at 12:02, you are in absconder status, which means that you are a fugitive and I will issue a warrant for your arrest. You don't want that to happen. Nobody wants that to happen. That ups the ante considerably.

So it is going to be your responsibility to get yourself where you need to be and allow appropriate time to get there. Okay?

THE DEFENDANT: Yes.

THE COURT: Anything else from the government?

MR. PROCTOR: No, Your Honor.

THE COURT: Mr. Fetherston?

PROBATION OFFICER: No, Judge.

THE COURT: Mr. Steinle.

MR. STEINLE: No. Thank you, Judge.

THE COURT: Thank you, everyone.

Good luck to you, Mr. Churchill. And I look forward

to talking with you.

THE BAILIFF:  All rise.

(Hearing concluded at 10:09 a.m.)

*       *       *

                        C E R T I F I C A T E


        I, JOHN T. SCHINDHELM, RMR, CRR, Official Court
Reporter and Transcriptionist for the United States District
Court for the Eastern District of Wisconsin, do hereby certify
that the foregoing pages are a true and accurate transcription
of the audio file provided in the aforementioned matter to the
best of my skill and ability.


Signed and Certified September 9, 2020.

/s/John T. Schindhelm

John T. Schindhelm


                John T. Schindhelm, RPR, RMR, CRR
                 United States Official Reporter
                 517 E Wisconsin Ave., Rm 236,
                     Milwaukee, WI 53202
                 Website: WWW.JOHNSCHINDHELM.COM

